May it please the Court, I'm Elizabeth Carlisle. I'm here this morning on behalf of Anthony Lemicy. There are several issues in the brief. I plan to address this morning the sufficiency of evidence issues and the waiver of counsel issue. Of course, I'll be glad to talk to the Court about other issues that are raised in both my briefs and Mr. Lemicy's supplemental brief which the Court permitted to be filed. Taking the sufficiency of the evidence issues first because they're dispositive, there is no question that Anthony Lemicy is a pedophile. There is no question that Anthony Lemicy did terrible things to minor children. He is serving, or I guess will serve if he lives long enough, a 19-year state sentence for that conduct. The question here is whether the government in this case presented the evidence for which he received 120 years that he used, knowingly employed, used, persuaded, induced, enticed, and coerced minors to engage in sexually explicit conduct for the purpose of producing a visual depiction of the conduct. That purpose issue applies to all three counts. I'll talk a little bit more about count one in a minute, but the purpose issue applies to all three of them. Again, the issue is whether the child was used to engage in sexual activities for the purpose of producing videos. The government seems to suggest that if he intentionally produced the videos, that's enough, but that's not what the statute says. And in this case, they didn't really present any evidence that, in the case, that the purpose of the sexual activity was to produce the videos. There was no testimony from the victims in this case, so we don't have the cases where the victims say, well, yeah, he told me to move this way and move that way so he could get a better picture. We don't have multiple large numbers of videos where it looks like he's perfecting his technique. We don't have – the fact that he uses a phone is clearly not enough. I mean, I think the cases say everybody's got a phone. What about if he uses the phone, he starts in one location, moves to another location, and focuses in on the genitalia? Well, okay, and that's count one, because it doesn't happen in the other counts. But, first of all, the focus is in on the genitalia issue is something that the government and I just disagree on. I'm sorry I had to subject you to those videos, but I did, and I guess you're just going to decide by looking at them whether you think there was a focus on the genitalia. Frankly, I just don't think there was. And he moves around, but I don't – again, I don't think – Well, it seems kind of purposeful if you move around and you manipulate the shower curtain, right? Because he's on one side, moves the shower curtain, moves to the other side, moves the shower curtain. I mean, there's some things going on that – Frankly, I don't remember us moving the shower curtain, but you've seen it clearly more recently than I have. I'm sorry. I don't know if you know, but the situation in these cases is they don't give me the videos, so I couldn't review them again for oral argument without going to the FBI office in Kansas City again and doing it. Yeah, I understand. But I mean, I guess – but the problem is all they're doing is – unless you find that there really is a focus on the genitals, all they're doing is taking a shower. True. He's not saying to them, move this way, show me – Yeah, there's no directing, there's no – yeah, I get that. And, you know, again, I think that's the critical thing about the issue of whether – particularly in counts two and three, the purpose of the conduct was to produce videos. He never – he really, I think, clearly did the best he could to delete these videos. It turns out none of us can delete anything from our phones. Some of them I guess he didn't quite manage to do that, but he didn't – you know, he didn't distribute them in any way, he didn't upload them, he didn't show them to anybody. And so the videos, I think, were pretty clearly not the point. I do want to say that one of the cases I cited about the phones is the Crandon case, and I noticed that I did not tell you what circuit that was. It is Third Circuit, and I apologize for leaving that out of the statement. Can the other images be used in conjunction with the videos to indicate the motive and intent of the defendant? You mean the fact that some of them were stills and some of them were videos? Yes. I don't think so in this case. Not the fact that they were stills, but the actual still images be used to help indicate why the videos were created. Well, why the videos were – I mean, I'm not sure why the videos were created is quite as important as the issue of whether the activity was intended to – was done for the purpose of producing the videos. And I think the problem with making inferences from the fact that there were stills as well as videos – I mean, I don't know about you, but sometimes I take one or the other without being able to tell which I'm doing at the time. But again, there's no suggestion here that he made this collection of videos and was going to do something with it. And that – from that, you could certainly infer that the purpose of the conduct was to produce the videos. But I just don't think that's what happened here. What about – there was one point, and I apologize if you mention this, about turning on the flashlight on the phone where he actually turned it on during one of these sexual encounters. Because he clearly wanted to make a good – he wanted to make a video. But again, the question is not did he want to make a video. It's was he engaging in this conduct for the purpose of making a video. And, you know, I hate to say it, but I think he was engaging in the conduct because for whatever perverse purposes people have when they engage in this conduct. Can it be both? It can be both. And why couldn't the jury's conclusion then be supported based on the jury making the conclusion based on its perception of the evidence? Well, because I think the jury – I mean, you know, in any insufficiency case, I guess you find that the jury was wrong when it made its perception. But while it can be both. There's still a very high standard to reverse a jury's conclusion of a determination of fact. I agree that that's true. But I really think that in this case, you know, the government just didn't present evidence from which the jury could reasonably conclude that. What the government presented here was somebody doing terrible things and taking videos. And, I mean, you know, I think that necessarily is probably prejudicial to a jury. But there's no way we can get around that because he did what he did. But anyway, so I guess that's what I'd say about that. So the evidence is insufficient for the jury to draw such a reasonable inference. That's what I'm suggesting.  Let me talk about the waiver for a minute or a couple of minutes before I go out of time. At the waiver hearing, in this case, waiver of counsel hearing, I'm sorry, let me be a little clearer. Mr. Lemesey said, you know, my lawyer won't present the evidence I want to – defense I want to present. He keeps telling me I should plead guilty. And the court says, well, you can have standby counsel. And Mr. Lemesey says, okay, I want standby counsel to help me through the legalities and technicalities of your courtroom. And so that was what Mr. Lemesey asked for. And the court responded that counsel would be very restricted in what he can do. That's all he said about it. He didn't say what those restrictions would be, you know, how that would work. And clearly Mr. Lemesey didn't understand how restricted it was going to be because he repeatedly from then on kept asking if counsel could do, you know, could introduce a document, could, you know, help him with jury instructions and things like that. And the government kept – and the judge kept saying, no, standby counsel can't do that. Well, first of all, you know, the courts have held that it's up to the discretion of the district court what standby counsel can do. And there are plenty of cases where standby counsel is permitted to do exactly that. So we're not in a situation where Judge Autry couldn't have said, okay, you know, Mr. Adderfeld, why don't you sit down with him and go over the jury instructions or, you know. And secondly, but probably more importantly, Mr. Lemesey, I think, was clearly pretty clueless about what it meant that all he was going to have was standby counsel. Mr. Lemesey made it abundantly clear he wanted to represent himself. Well, he wanted – I'm not sure that he wanted to represent himself as much as that he wanted to present the defense he wanted to present, which he perceived counsel as unwilling to do. But he never said, I don't want standby counsel to do anything. You know, he kept saying, I need help. No, he wanted his cake and eat it too, which is when you are pro se, you know, you can't then – standby counsel is standby, right? It doesn't mean you get to, like, use your counsel to do all the things you don't want to do. No, you're representing yourself. And that's just – I mean, it's just not how it works. You've got to make a choice. You either go with counsel that you're given or seek new counsel or whatever, or you go pro se. You don't get to do this. There's no hybrid model where you get to order your counsel around and tell them what to do, but then suddenly the client's in charge because that can get a lawyer in a lot of ethical trouble. Well, I mean, that's true, except that the concept of standby counsel is sort of fuzzy. And I think, you know, the problem is that many of the things that Mr. Lemelsey was asking for standby counsel to do, standby counsel has been – I mean, this court has commended district courts for letting standby counsel do. So, yeah, it's different, but it doesn't – you know, it doesn't mean that just because he has standby counsel, standby counsel just has to sit there. Was it erroneous, though, for the district court to sort of say at every point, standby counsel cannot do this or that, standby counsel can't do that, and then for him to have to abide by those conditions, which are the normal conditions? You might be right that some judges don't mind having standby counsel do some things, but is it wrong or erroneous for you to limit standby counsel? No, and that's actually not what I'm arguing. What I'm arguing is that the problem was when he waived counsel, which is the voluntariness point, he didn't realize what kind of restrictions there would be for standby counsel. And because of that, I don't think the waiver was voluntary. But then the problem with that argument is the district court told him over and over again and said, are you sure now you don't want to – like later, are you sure now you don't want standby counsel to take over? No, no, no, I don't want – in other words, he expressed his preference for having things remain the same, I think. I don't read the record that way. I don't think he said, are you sure you don't want standby counsel to take over? What he said was, you don't have to have standby counsel. You can do this all by yourself. But he never actually offered him the opportunity to have standby counsel take over, and I think he should have.  Come back and be counsel. I don't think he offered him that, and I think he should have. That would have solved the problem. But the other problem is that initially he really didn't make clear with, you know, what the implications of just having standby counsel would be. Ms. Marlowe, your time is quickly passing, but I did want to ask you about what the record tells us about the pro se brief raising issues relating to the defendant being shackled in court. What's in the record to indicate whether that's a fact, whether that actually happened, and justification for it? Well, I'm not actually going to argue that point, but I can tell the court. I know you're not arguing it. I'm asking about what's in the record. I can tell the court that what happened was that Mr. Lemesey was brought in, you know, was brought into court in jail clothes and offered, and shackled, and offered clothing by the marshal service, as typically happens. I understand about the clothing. Okay. And he basically waived that by choosing not to accept the clothes they offered. What I'm specifically asking you is, is there something in the record indicating why he was shackled in the courtroom, and is there something in the record? Not to my knowledge. I mean, I'm not even sure the record really reflects that he was shackled. Well, that's my question. That's what I'm trying to find out.  That's my answer. But I haven't seen anything in the record indicate that. Okay. I haven't either. There's certainly, you know, there's certainly the discussion about the clothes, but there's nothing specific about the shackling in the record at all, and there's certainly no objection in the record from him about the shackling. What do we do with a claim like that, given that the record doesn't show it? Do you, I mean, he alleges it. What do we do with it? Well, he alleged that he was shackled, but there's no evidence that he was shackled. So I at least sort of found it hard to argue about that claim being based on the record. And it sounds to me like that might be better for post-conviction review, where he can establish a record, kind of like an effective assistance to counsel. Sorry for taking so much of your time, but I'm just trying to figure that out. Okay. I'll supply you some time to continue after. I appreciate that, Your Honor. We'd ask that the court reverse the conviction and sentence, or in the alternative, remand for retrial after revisiting the waiver issue, or in the alternative, remand for resentencing. Thank you. Thank you, Ms. Carlyle. Ms. Lange, and while it's fresh, maybe you can help us out if there's anything in the record to indicate what the facts are with relation to an allegation of being shackled. Thank you, Your Honor. As you stated, my name is Colleen Lange, and I represented the government at trial in this matter. As far as the record on the ankle or the leg restraints, there's only one brief mention of it in the entire record, and that was during voir dire. One of the potential jurors stood up and asked why the defendant was in jail clothing, and ankle bracelets was his exact words. The court then went on to explain that it was not going to be the jury's responsibility to determine anything based on the clothing or what someone was wearing or how they appeared in court, and that the jury would be restricted to their findings on the facts and evidence presented to them, and not, again, on what the parties were wearing. That's the only indication in the record that the defendant had leg restraints on during the trial. He refused to change into clothes when he was brought up on the first day of trial. There was clothes waiting for him. At that point in time, he was in an orange jub suit, so it was obvious to everyone in the courtroom, including the potential jurors, that he was in the custody of the marshals of the court system. At that point in time, he never objected to the leg restraints being on. But they were on. They were on at the time. To the best of my recollection, they were on. Again, like I said, one of the potential jurors did remark on it at the trial. He did stay at the table the entire time that the case was being tried, and standby counsel would go up to the witness stand if he needed to present any exhibits on his behalf. We have cases to talk about what should happen if a defendant is going to be restrained during trial, and ordinarily there are findings that we would anticipate whether there's been an objection or not. I mean, I was a district judge for a long time, and I don't think I'd ever let anybody sit in a courtroom shackled without explaining for the appellate court what happened and why. It's undisputed that he was shackled, or partially shackled. Yes, just leg restraints. Yeah, just leg restraints. There's nothing above the table. Right, but the fact that it was visible, and we know it's visible, because in this case we have a juror who's actually asked the question, and I assume in voir dire, this was not individualized voir dire, so every single person, if they didn't notice it before, it was brought to their attention. So we now know that everybody on that jury knows that this is a dangerous man because we've got him in leg irons. Well, at that point in time, everyone knew he was in custody because he refused to take off his orange jumpsuit. But there's a big difference between just being in custody and showing up in a courtroom in leg irons. Well, I think they kind of go hand in hand, and at that point in time he's already in custody. The jury has seen him in his orange jumpsuit. They know he's being restrained. I wonder if the difference here is, at least as a constitutional matter, and, of course, this wasn't fully briefed because it came in a pro se brief, but we require on the jumpsuit side, or at least the Supreme Court requires compulsion. In other words, where you need findings is where the district court says you must wear your jumpsuit or you must wear your shackles because you have done something that requires that. And here it just seems like it sort of happened. Nobody told him to, and, in fact, the district judge came in and said, not about the shackles, but maybe you don't want to be wearing that. Maybe you should wear a suit. Maybe if he was wearing a suit, he wouldn't have shackles on. I don't know. But my point is this is not a great situation, but I wonder, as a constitutional matter, whether the absence of compulsion here means there's no violation. I mean, I don't think, because he had the opportunity to change clothing and he did not. Therefore, the jurors knew that he was in the custody of the government or of the marshals. And he never objected to wearing the leg restraints. There's no indication in the record that he objected to that at all. He never asked for them to be taken off. And he never asked to go ahead and change into clothes when he knew there was clothes available for him if he wanted to change. Well, and more importantly, did the district court or the prosecutor ever say? I don't know. I think you prosecuted. I was one of two that, yes. Did they ever say you have to wear shackles? Did somebody tell him he had to wear shackles? No. No one ever told him he had to wear shackles. There's nothing on the record that reflects that he was forced to wear shackles. I believe it was just a situation, since he didn't go and change, that we went ahead and got started. He was still in what he was wearing when the marshals brought him into the courtroom. And, again, he didn't object. And I'd also say because he didn't object and because he wanted to wear his orange jumpsuit, that, again, he is not adequately – he waived this. It's invited error at that point when he asks to wear the orange jumpsuit and then tries to bring it up in his supplemental briefing that that was prejudicial. And I'd also like to point out that the evidence in this case was overwhelming. So if there is any – I don't think he was prejudiced by wearing the jumpsuit and the leg restraints because the evidence in the case was so overwhelming, there was a lot for the jury to have more than sufficient evidence in this case to find him guilty. Well, do you think this is invited error waiver or is this plain error? It seems to me like it may be waiver as to the jumpsuit because he was specifically asked about it and said, hey, I'm fine with the jumpsuit. I don't want your loner suit. But as to the shackles, wouldn't that be plain error because nobody ever asked him about it? He just failed to object. So it's forfeiture. Correct, Your Honor. Okay. And I'd also like to point out that wasn't raised in the actual appellate brief. So I'd also argue that at that point it was not adequately preserved for the appellate purposes. And moving to the pro se issue that was brought up by the appellant, the record reflects that Lemesee was adequately informed of the consequences of representing himself and that the role of standby counsel would be very limited in this case. He was informed first at the magistrate level at two separate hearings, one in October and then another one a month later in November. She did the Feretta warnings with him, went through those very thoroughly, asking him what experience he had, really suggesting that she thought it was a bad idea that he proceed pro se, and told him on numerous occasions that standby counsel's role would be very limited and that he would really just be there to assist with that. Mr. Lemesee would be doing all the questioning. He would be introducing exhibits. He would be filing motions. That was all on him. And after being explained that twice by the magistrate judge, there was a very detailed thorough hearing in front of the district court with his standby counsel present, in which he again brought up some complaints that he had and the district court explained to him, you can't have it both ways. You are the attorney here. You wish to proceed pro se. These are the things that you have to do. And then his standby counsel told him on the record, listen, I'm here as your standby counsel, but if you want me to be your attorney, I will jump back in at any moment in time and represent you. I am prepared to do that. Well, and just I asked opposing counsel about this, but I thought in front of the district court there was at least an interaction that said between the district court and Mr. Lemesee that said, if that basically standby counsel is there in case you decide not to do this anymore, like proceed pro se, did that actually happen? That was my understanding of the record. There was never a time where Mr. Lemesee said I don't want to do this anymore and I want standby counsel to take over. But there was during the July 2020 hearing with just standby counsel, the district court, and Mr. Lemesee, there was conversation that that was a possibility if he wanted to entertain it. And he never did. But he knew he had the right to an attorney, and he knew his standby counsel was ready to proceed and take over if he felt at any time he could not represent himself. But as the district court told him, he's responsible for filing motions. If he wanted and he did want to proceed pro se, it was his job to file the motions, it was his job to ask the questions, it was his job to figure out his trial strategy. As to the issue which was raised in the second part of Appellant's brief, whether or not he intended to create the images and videos of child pornography, the jury in this case saw all of the videos of child pornography that the government charged Mr. Lemesee with. And those videos, there are several videos, some of them are on different dates and they're at different times, they're different children. And the length of the videos themselves comes into play about whether or not that was his purpose, was to record those sex acts with those children. And the jury saw all of that, and because the evidence was sufficient to permit a rational jury to find beyond a reasonable doubt, that that was one of his dominant purposes, was to create those videos of those sex acts, then the evidence in this case was sufficient to show his intent and what his purpose was. In count two, the focal point of that video is the child's genitals and his genitals trying to penetrate hers. And it goes on for two and a half minutes. The camera is not wiggling, it is not fuzzy, it is focused on just that act. At the very end of that video, you see the child's face briefly because it appears that she wakes up, she tells him to leave her alone and she starts to move and move her legs. At that point, the camera does move. But up until then, it was clearly steady and recording the sex act going on. This wasn't an accident that he recorded it. And Judge Strauss, as you pointed out in the Fortier case, in that case the defendant tried to argue that the four separate recordings that he had with minors having sex was an accident because he was trying to use a flashlight within a video app. And you penned that and said, well when you look at the content of the videos and the circumstances surrounding it, whether or not to accept that explanation, that is a classic jury call. And in this case, the jury saw the evidence and they heard all the evidence and they determined that in fact he intended to produce those videos of the sex acts. Let me ask you this. One of the things that we considered in Fortier, I don't know if it ultimately made it in the opinion, but it applies here, which is you have four separate recordings. I'm not suggesting that one recording could never meet the standard. That's not what I'm suggesting. But I wonder if it's doubly clear when you have, or triply, quadruply, I don't even know what word that is, but quadruple clear that somebody is trying to video record it when you have separate recordings with separate minors. In other words, it's hard to argue at that point that it's an accident when you have multiple recordings. That can bear on intent as well. I would agree, Your Honor. And on the July 8th recordings, that's count two and three. Count two, he recorded again for two and a half minutes of attempted vaginal penetration. He then turns the camera off for two minutes. We assume at that time he flips the child over and then he tries to anally penetrate her for 90 seconds. Again, the camera is not shaking. This isn't something where it appears that it's being held steady right at the focal point of the sex acts. Then about almost ten days later, on the 17th, so eight, nine days later, he then records that child's genitals. That was when it was dark at first. Then a light comes on, and clearly the focal point is her genitals. She tells him, don't record it. At that point, he actually stops recording it, which goes back to the purpose of why he was doing it. He takes two image shots, still shots, of that child at that moment in time. The detectives testified when they went through all the forensics the dates and times of those videos. Then a few days later, he records the two separate shower videos of the eight-year-old and the 11-year-old child in the shower. Was that done by... I'm just curious. I think the answer is yes, as I recall. Were those done with a hand recording, or were they done with a hidden camera in the bathroom? They were hand recording. This is not a hidden camera case. He never recorded, he never hid a camera in a bathroom or a bedroom. He was in the room with the children. In the one with the shower, he is in the bathroom. It's clear he's recording with his cell phone. He is at one end of the shower. The children see what's going on. They start to turn to face the shower head. He goes closer to the other side of the shower where the shower head is, moves the shower curtain back. Then at that point, he doesn't need to direct the children what to do because he himself moves closer to their pubic area and at that point is only filming their pubic and genital area. There's no other focus in the video. He does that for several moments, holding the camera still there before he turns it off, and then moments later turns it back on to record a little bit more of the shower. The jury saw all of this. They saw that there were multiple victims and believed that it was more than sufficient evidence to find him guilty of those four counts of production of child pornography. Just briefly, Your Honor, as to the last two points raised in the appellate's brief, the government believes that the criminal history score was properly calculated. Mr. Lemesee was found guilty in state court of sexual misconduct against victim MR. She was one of the children in the shower. However, in the state court case, he was found guilty, and it was clear from the PSR, of exposing himself to her two days approximately before the shower video was taken. That's a separate offense from what he was doing when he created the child pornography video of her in the shower. He was not exposing himself to her while the shower video was happening. They were two separate, distinct criminal acts, and therefore the criminal history score was properly calculated. As to his last argument, was whether or not the sentence was reasonable, while it is a large sentence, it was a within-guidelines sentence, which is presumptively reasonable. There were three victims in this case, and their ages were only 7 to 11 years old. The 7-year-old child was... There were some horrific videos that the jury had to watch in this case of him sexually abusing that 7-year-old child, and therefore the sentence in the case was warranted. Unless there's any further questions, at this time I'd ask the court to affirm the conviction and sentence in this matter. I see none. Thank you, Ms. Lyon. Thank you, Your Honor. Ms. Carlisle, if you have some responses. I appreciate the court's indulgence for that. First of all, in terms of the shackling, in terms of the suggestion that it's not preserved, I'm starting to wish I'd preserved it, but I think Mr. Lemesey did. He was permitted by this court to file a supplemental brief, and the government responded with a 28-J citation, so I think that issue is before the court. It's before the court. The question is, what's it reviewed for? Is it reviewed for plain error because there was a failure to object to the shackling at the time that it took place? Yeah, I think so. I can't really argue. Obviously, if his waiver of counsel was involuntary, then that might change that complex, but you wouldn't have to get to the shackling if you did that. He certainly didn't object to shackles specifically at the time. Again, Ms. Lang keeps saying the question is whether he intended to take the videos or whether they were an accident. That's not the question. I think it's clear that he intended to take the videos, and I've never said anything else. The question is whether the purpose of the sexual activity was for producing the videos. Does the fact that there are multiples of them make any difference? You heard me ask opposing counsel. It's one thing if you take one, but when you take four, it's kind of hard to argue that that wasn't a purpose of the activity. I don't think so. He clearly apparently wants to engage in these acts, and he clearly apparently wants to make videos, but I don't think that necessarily implies a connection between I'm doing these acts in order to produce the videos. That's the question. I find it hard why there's not enough for a jury to be able to make that decision. That's what I would like to hear from you. Why isn't there enough evidence for the jury to have reasonably made the conclusion it did? Again, because I don't think that there's anything about the videos and the way they were produced and the way they were developed that's like the cases that say there's enough evidence which suggests a system or producing videos to upload them or producing videos to sell them. The only thing we have here, I think, is the two facts. He did terrible things to the children and he took pictures of it, and I don't think that's enough to satisfy the statute. Is it insufficient as a matter of law that one might be recording the incident in order to preserve the images for their own personal gratification? No, that wouldn't be insufficient. I don't think that there's evidence that that happened, though, particularly since he... Couldn't a jury look at this and say it's happened repeatedly, there's a focal point on the penetration, that that in itself is evidence of an intent to preserve? Isn't that an inference that they could reasonably draw? I guess, I mean, I'm not sure that I really think it is. I mean, when he, particularly coupled with the fact that he at least attempts to get rid of them. So, I mean, he, you know, the forensic examination of the phone revealed him, he would have had a lot of trouble looking at him again. And there isn't any evidence that he, that he did that or that he tried to do it. There was no, I think sometimes I've seen evidence, you know, we can show that this was viewed, you know, 18 times. If they presented that, I think that would have been helpful, but, to the government. But I don't think what we have here is. And one more thing I would say, you know, Ms. Lange, who was trial counsel, asked for a 90-year sentence and the judge gave him 120. I really think the reasonableness of the sentence is before the court. Thank you. Thank you, Ms. Carlisle. The court appreciates both counsel's participation in the argument before us. Consider the case submitted. And, Ms. Carlisle, we thank you for serving as representative of the defendant under the Criminal Justice Act. Consider the case submitted. We will render decision in due course.